IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| v. | * | Criminal Action No. RDB-13-00063 |
| BRANDON HORTON, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Defendant Brandon Horton ("Defendant" or "Horton") has been charged in a one count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Defendant filed a Motion to Suppress Evidence and Supporting Law (ECF No. 18) contending that the police lacked reasonable suspicion to effect the stop on the car in which he was a passenger and in which the firearm was found. The parties' submissions have been reviewed and this Court held a hearing on May 22, 2013 to consider the pending motion. This Court withheld ruling at that time and ordered further briefing. For the reasons that follow, Defendant Brandon Horton's Motion to Suppress Evidence and Supporting Law (ECF. No. 18) is DENIED.

### FINDINGS OF FACT

**I.  2100 Block of Druid Hill Avenue Police Investigation**

In the early morning, minutes after midnight, on January 25, 2013, Officers Scott Reid ("Reid") and Paul Sinchak ("Sinchak") were patrolling in a marked vehicle on Druid Hill Avenue in Baltimore, Maryland. Mots. Hr'g Tr. at 17-20. According to Officer Reid, there had been recent calls and complaints about narcotic activity in this area. *Id.* at 20.

Upon patrolling the area, the officers noticed "several individuals in the 2100 block of Druid Hill Avenue." *Id.* at 18. Officer Reid thought this behavior to be "strange" because of the weather conditions—20-degree temperature, snow and ice on the ground—and the lack of "convenience stores in that block." *Id.* at 19-20. Officer Reid testified that based on his training and experience, he believed that the "individuals were participating in narcotic activity." *Id.* at 20. Once the individuals noticed Officers Reid and Sinchak's patrol car, they dispersed "in various directions" causing the officers to believe that they were dispersing to "avoid detection or arrest." *Id.* at 20-21, 125.

Shortly thereafter, Officer Reid asked Officer Sinchak to stop the police vehicle so he could get out and covertly observe the narcotics activity taking place. *Id.* at 21. Officer Sinchak stopped the vehicle permitting Officer Reid to exit and then stationed the patrol car out of the area, "two or three block[s] away," so as not to be noticed by potential lookouts. *Id.* at 22-23. Officer Reid then began watching the activity on the 2100 block of Druid Hill Avenue from the "corner of [a] building" at ground level. *Id.* at 23. Less than five minutes later, a dark sedan pulled up "right across the street" from Officer Reid, and he observed as "one of the individuals walked down and approached the vehicle at the passenger's side window." *Id.* at 24, 25, 43, 70. According to Officer Reid, the driver handed the individual money and the individual headed north toward a house on the 2100 block of Druid Hill Avenue. *Id.* at 26, 71. The house was later identified to be located at 2106 Druid Hill Avenue. *Id.* at 55, 87. Once at the house, the individual was met on the front steps by another individual who took the money in exchange for "something small." *Id.* at 26, 72.

The individual then returned to the dark sedan and appeared to give the small object to the driver. *Id.* at 26, 73.

Based on these observations, Officer Reid believed that a drug transaction had occurred. *Id.* at 30. He returned to the patrol car where Officer Sinchak was waiting, and proceeded to conduct a traffic stop of the dark sedan. *Id.* at 31. Upon approaching the driver, Anthony Smallwood ("Smallwood"), Officer Reid saw "two yellow top vials sitting in the [driver]'s lap" containing "suspected cocaine." *Id.* at 32, 34, 76. The officers seized the vials and the driver admitted to having purchased the narcotics from a woman on Druid Hill Avenue. *Id.* at 33. The officers released Smallwood who was not issued a citation or arrested. *Id.* at 34. According to Officer Reid, Smallwood was released because they were hoping to "find out where the drugs were being sold from" by pulling several cars over, possibly recovering drugs and obtaining a search warrant for the house from which it appeared that the drugs were being sold. *Id.* at 34, 42.

After releasing Smallwood, Officer Reid returned to the 2100 block of Druid Hill Avenue and climbed to the roof of a row house on that block. *Id.* Officer Sinchak again stationed the patrol car at a distance of Druid Hill Avenue so as to avoid raising any suspicions. *Id.* at 35. From the roof, Officer Reid could observe "individuals . . . walking on both sides of" Druid Hill Avenue. *Id.* at 39. Within the next forty-five (45) minutes, Officer Reid testified to having seen "anywhere between seven and ten more [drug] transactions." *Id.* at 39, 41, 42, 44. With respect to the woman who sold narcotics to Smallwood, Officer Reid testified that she would approach vehicles, which would not park directly in front of the place where the drugs were stashed. *Id.* at 40, 44. The cars would pull over on "both the

3

east and west side of [Druid Hill Avenue]," as well as on Bloom Street. *Id.* at 40, 82. The woman would then take U.S. currency and walk back to the row house. *Id.* at 40. There she was met on the front steps by an individual who would take the money and hand her a small object or objects. *Id.* at 40-41, 46, 87, 89. She would then deliver the small object or objects to the vehicles, which would then pull away. *Id.* at 41, 42, 77, 86-87, 90.

Although the woman was the only "person who was going to get the drugs" at 2106 Druid Hill Avenue, Officer Reid testified that she would not always deliver the narcotics to the stopped vehicles. *Id.* at 86. According to Reid's testimony, there were a number of other individuals "roaming . . . back and forth from the east side of the street to the west side of the street." *Id.* at 44-45. According to Officer Reid, these other individuals seemed to be taking orders while the woman would go to the row house to get the drugs. *Id.* at 87-88. Essentially, the pattern Officer Reid witnessed was that a vehicle would pull into the area, a person in the vehicle would interact with either the woman or other individuals roaming the street, the woman would then go to 2106 Druid Hill Avenue, the suspected stash house, participate in an exchange of currency for suspected narcotics, then the woman or another suspected drug dealer would return to the vehicle, and the vehicle would then depart from the area. *Id.* at 40-41, 87-90.

After witnessing every transaction, Officer Reid testified to advising Officer Sinchak to stop the vehicles involved in the alleged drug transactions. *Id.* at 41. However, due to Officer Sinchak's location and "the direction the vehicles left," Officer Sinchak was unable to effect a stop on any of the seven to ten vehicles allegedly involved in these transactions. *Id.* at 42.

4

## II. Defendant Brandon Horton's Arrest

At approximately 1:30 a.m., Officer Reid observed a silver Buick entering the 2100 block of Druid Hill Avenue. *Id.* at 45, 95. The car stopped on the north side of the block which meant that Officer Reid could only see the front "half of the vehicle." *Id.* at 45, 97. The woman previously identified as a drug dealer walked to the passenger's side window of the silver Buick. *Id.* at 46, 99. The woman and the driver engaged in a "brief conversation." *Id.* at 46. The woman then walked southbound toward 2106 Druid Hill Avenue where Officer Reid testified that she handed a man currency on the front steps and received "some small objects." *Id.* at 46, 101. Subsequently, the woman did not directly return to the silver Buick, she instead crossed the street eastbound and walked north which "threw [Officer Reid] for a loop" and he lost sight of her. *Id.* at 46-47, 101. Then, "anywhere between 30 seconds and a minute [later, Officer Reid] saw an individual cross back over the street and walk behind" the silver Buick. *Id.* at 47; *see also id.* 102. It is Officer Reid's testimony that, at the time, he believed it was the same individual, the woman, who crossed the street toward the silver Buick. *Id.* at 47. Officer Reid also testified that he did not see anyone enter the silver Buick or engage in "a second conversation with the driver." *Id.* at 50; 105-06.

Immediately thereafter, the silver Buick headed southbound on Druid Hill Avenue, drove "right in front of where [Officer Reid] was [stationed] on the roof," allowing him to see that the side of the vehicle read "Sedan Service." *Id.* at 50-51. At that time, Officer Reid radioed the vehicles' description to Officer Sinchak who then proceeded to stop the silver Buick. *Id.* at 51, 54. Upon stopping the vehicle, Officer Sinchak noticed that there were two occupants in the vehicle, a driver and a passenger. *Id.* at 140. As he approached the driver's

5

side window of the silver Buick, Officer Sinchak testified to hearing a "loud thud com[ing] from the vehicle." *Id.* at 136-37. Officer Sinchak then looked "inside of the rear driver['s] side window . . . and . . . saw in plain view on the rear driver['s] side floorboard a black semiautomatic handgun. *Id.* at 138. Officer Sinchak then ordered the driver and passenger out of the vehicle and attempted to secure the weapon. *Id.* at 141. As he opened the rear door to secure the weapon, the rear passenger, later identified as Defendant Brandon Horton ("Horton"), "exited through the rear passenger['s] side door." *Id.* Horton then struggled with Officer Sinchak, broke free and began running away. *Id.* at 143. Horton was ultimately arrested and charged with being a felon in possession of a firearm. *Id.* at 141-44, 165. In a search incident to arrest, officers did not find any narcotics in the vehicle.

During the Motions Hearing, the driver of the silver Buick, Elijah Miller ("Miller"), testified that he was operating a silver Buick for a Sedan Service that night. *Id.* at 178. Miller had been dispatched to Druid Hill Avenue on a legitimate service call to 2140 Druid Hill Avenue. *Id.* Miller testified that when he arrived at the location, he called Defendant Horton. *Id.* at 66-67. While he was waiting, he was approached by the woman on the passenger's side of the silver Buick. *Id.* at 179. When the woman noticed that he was driving a Sedan, she walked away and they never spoke again. *Id.* at 179-80. He also testified that he did not purchase any drugs and that once Horton entered the Sedan, he drove away. *Id.* at 180.

## ANALYSIS

Defendant Brandon Horton ("Defendant" or "Horton") seeks to suppress the evidence seized from the silver Buick, namely the firearm which forms the basis of this case.

6

Specifically, Defendant contends that Officer Reid's observations did not create reasonable articulable suspicion that an occupant of the silver Buick had engaged in criminal activity.

Preliminarily, the Supreme Court has affirmed "all Federal Courts of Appeal, and nearly every state court, [which have] ruled on the question" by holding that a traffic stop is a seizure of both the driver *and any passenger*, and as a result, either "may challenge the constitutionality of the stop." *Brendlin v. California*, 551 U.S. 249, 251 (2007) (emphasis added). As such, Defendant Horton has standing to challenge the stop.

The crux of this case is whether Officer Reid's observations taken as a whole create reasonable articulable suspicion to believe an occupant of the silver Buick had engaged in criminal activity. As the United States Court of Appeals for the Fourth Circuit has recently noted:

> The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment does not proscribe all contact between the police and citizens, but is designed to prevent arbitrary and oppressive interference by law enforcement officials with the privacy and personal security of individuals.

*United States v. Black*, 707 F.3d 531, 537 (4th Cir. 2013) (citations and internal quotation marks omitted). "An officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop when the officer has reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry v. Ohio*, 392 U.S. 1, 30 (1968). While the "reasonable suspicion" standard is not an onerous one, there must be "at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123; s*ee also, e.g.*, *United States v. Harris*, 39 F.3d 1262, 1268-69 (4th Cir. 1994). "The officer must be able to articulate more than an 'inchoate and

unparticularized suspicion or hunch' of criminal activity." *Wardlow*, 528 U.S. at 123-24 (quoting *Terry*, 392 U.S. at 27).

The Fourth Circuit has held that an officer must have an objective right to stop a vehicle, irrespective of the officer's "subjective motivation" or suspicion. *See United States v. Hassan El*, 5 F.3d 726 (4th Cir. 1993). "[T]he Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband." *United States v. Foster*, 634 F.3d 243, 248-49 (4th Cir. 2011). Accordingly, whether there is reasonable suspicion turns on "the totality of the circumstances . . . including all information available to an officer and any reasonable inferences to be drawn at the time of the decision to stop a suspect." *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir. 1989); s*ee also United States v. Arvizu*, 534 U.S. 266, 751 (2002).

Courts have accepted a number of factors as properly contributing to the creation of reasonable suspicion. The Fourth Circuit has held that reasonable suspicion calls for "a common-sensical proposition . . . [properly] crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993); *see also Adams v.* Williams, 407 U.S. 143, 145 (1972) ("The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow crime to occur or a criminal to escape."). Additionally, "[w]hile the defendant's mere presence in a high crime area is not by itself enough to raise reasonable suspicion, an area's propensity toward criminal activity is something that an officer may consider." *Lender*, 985 F.2d at 154 (citations omitted). Moreover, "[t]he lateness of the hour is another fact that may raise the

8

level of suspicion." *Id.* (citation omitted). Evasive conduct, furtive behavior and anonymous or informant tips have also been held to support findings that reasonable suspicion existed. *See, e.g.*, *United States v. Sims*, 296 F.3d 284, 285-87 (4th Cir. 2002) (anonymous tip and furtive behavior constituted reasonable suspicion); *United States v. Sprinkle*, 106 F.3d 613, 618 (4th Cir. 1997) ("Evasive conduct can, of course, assist an officer in forming reasonable suspicion."); *Alabama v. White*, 496 U.S. 325, 328 (1990) ("[W]hile the unverified tip may have been insufficient to support an arrest or search warrant, the information carried sufficient 'indicia of reliability' to justify a forcible stop.").

In this case, the totality of the circumstances supports the conclusion that Officer Reid had reasonable suspicion that someone in the silver Buick engaged in a drug transaction. First, it is undisputed that the Druid Hill Avenue area relevant to this case is a high crime area. Moreover, there had been several complaints about narcotic activity in that area and Officer Reid confirmed that it was essentially an open-air drug market. Second, the events leading up to and including Defendant Horton's arrest occurred late at night. Specifically, the record reflects that Officer Reid and Sinchak began patrolling that area on or about 12:05 a.m. and that Horton was arrested a little before 2:00 a.m. Third, the record reflects that based on his training and experience, Officer Reid witnessed not one or two, but at least eight to eleven drug transactions, one of which was confirmed, between 12:05 p.m., when he and Officer Sinchak first arrived in the area, and 1:30 a.m., when the silver Buick pulled up north of the 2100 block of Druid Hill Avenue. The record also reflects a consistent pattern across every observed transaction: (1) a car would pull up in the area on either the east or west side of Druid Hill Avenue without parking directly in front of the

9

suspected stash house; (2) a suspected drug dealer—whether the woman or someone else—would approach the vehicle; (3) the woman would then walk up the steps of 2106 Druid Hill Avenue where she would meet a man and she would exchange currency for small objects; (4) she or another suspected drug dealer would then return to the idling vehicle; and (5) ultimately the vehicle would thereafter leave the area.

    This similar pattern occurred when the silver Buick pulled up in the area. While the record now reflects that the silver Buick was in fact a Sedan Service sent there to transport Horton to another location, given his observations Officer Reid was likely to suspect that it came to engage in a drug transaction. Officer Reid admitted that he had limited visibility of the area where the sedan was stopped. Nevertheless, his observations were consistent with the pattern he had previously observed. He saw the woman approach the driver, walk up to the stash house, exchange currency for small objects, walk across Druid Hill Avenue, then disappear briefly, only to see someone walk back across the street behind the silver Buick prior to the sedan's departure. Although the Defendant repeatedly argues that in the silver Buick's case, no individual returned to the driver, Officer Reid testified that he saw someone walk behind the silver Buick and that, at the time, he believed that individual to be the same woman he had first seen speak to the silver Buick's driver and exchange currency for a small object or objects on the steps of 2106 Druid Hill Avenue. As the Fourth Circuit has stated, officers are not required "in the absence of probable cause to 'shrug [their] shoulders and allow a crime to occur." *Lender*, 985 F.2d at 154. As Officer Reid "suspected illegal activity, [he] responded precisely as the law provides: [he] attempted to investigate further" by

informing Officer Sinchak of the description of the vehicle and the direction it was heading in. *Id.*

In a further attempt to invalidate the stop, Defendant argues that this case is similar to *United States v. Sprinkle*, 106 F.3d 613 (4th Cir. 1997). In that case, a police officer spotted an individual, whom he knew to have a criminal record, in a vehicle. *Sprinkle*, 106 F.3d at 615-16. A few seconds later, another unidentified individual came out of a house across the street and entered the vehicle from the passenger's side. *See id.* at 616. As the officer walked in front of the car, he noticed the two "huddled to the center of the console of the vehicle with their hands close together. [The officer] believed that [the passenger] was passing or about to pass [the driver] something." *Id.* When the driver saw the officer, "he put his head down and put his hand to the left of his face as if to conceal his face from" the officer. *Id.* The driver then left the area "in a normal, unsuspicious fashion" without speeding. *Id.* The officer suspecting that they were engaged in illegal activity and effected a stop of the vehicle. *See id.*

The government relied on the following factors as a basis for the officer's reasonable suspicion: (1) the officer's knowledge that one of the men had a criminal record and had recently been released from prison; (2) the fact that the suspects were in a high crime neighborhood; (3) the fact that the officer observed them huddled in the middle of the car with their hands close together; (4) the fact that one suspect shielded his face to avoid recognition; and (5) the fact that they drove away as soon as the officer walked by the car. *Sprinkle*, 106 F.3d at 617. In that case, the Fourth Circuit held that a "prior criminal record is not standing alone, sufficient to create reasonable suspicion." *Id.* (citation omitted).

Additionally, the Fourth Circuit held that being in a "high crime neighborhood at 5:30 p.m. on a sunny day does not provide independent or freestanding ground for reasonable suspicion." *Id.* (citation omitted). Ultimately, the court stated that the officer's "impression that they were in the midst of a narcotics transaction" was insufficient to support a reasonable articulable suspicion finding given the fact that the officer had seen "no drugs, no money, no weapons and no drug paraphernalia. Nor did he see either man try to conceal any object." *Id.*

*Sprinkle* is markedly different from the case pending before this Court. As mentioned above, the events occurred late at night. Moreover, the vehicle in which the Defendant was a passenger was stopped after having been in a high crime area and having essentially been observed to engage in a similar pattern as other vehicles engaging in suspected drug transactions, one of which was a confirmed drug transaction. Officer Reid testified to seeing the woman give currency to a man on the steps of 2106 Druid Hill Avenue, every time she was there, in exchange for small objects that he could not identify. Officer Reid also testified that while she was not the only individual approaching vehicles, she was the only one who went to the stash house, sometimes for her clients, at other times on behalf of other suspected drug dealers. Finally, Officer Reid testified that at the time he believed it was the same woman who had walked behind the silver Buick. Accordingly, the totality of the circumstances in this case support the conclusion that Officer Reid had reasonable articulable suspicion that a drug transaction had occurred when he instructed Officer Sinchak to stop the silver Buick. As a result, Defendant's motion is DENIED.

## CONCLUSION

For the reasons stated above, Defendant Brandon Horton's Motion to Suppress Evidence and Supporting Law (ECF No. 18) is DENIED.

A separate Order follows.

Dated: July 23, 2013

/s/_____
Richard D. Bennett
United States District Judge